FILED

MAR 2 2 2011

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DAVID J. HANSON, an individual,

        Plaintiff,

                                  CV 10-1161-PK

                                  AMENDED OPINION AND
                                  ORDER

ST. PAUL FIRE AND MARINE
INSURANCE CO., a Minnesota
corporation,

        Defendant.

_____

PAPAK, Judge:

      Plaintiff David Hanson brings this breach of insurance contract action arising from an

automobile accident that occurred in March 2007 while he was driving his own car to a business

meeting on behalf of his employer, ITC.  Hanson alleges that defendant St. Paul Fire and Marine

Insurance Co. ("St. Paul") refuses to make payment under an auto insurance policy that it sold to

Page 1 - AMENDED OPINION AND ORDER

Hanson's employer.  This action was originally filed in state court and later removed to this court.  Now before the court is St. Paul's motion for summary judgment (#8) and Hanson's cross-motion for summary judgment (#15).  The fundamental dispute between the parties is whether St. Paul's policy is an "excess liability polic[y]" exempt from under-insured motorist (UIM) coverage under Or. Rev. Stat. § 742.468, or conversely, whether it is a "motor vehicle liability policy" which must provide UIM coverage under Or. Rev. Stat. § 742.502.

Since the policy at issue is a not an excess liability policy as I construe that statutory term, St. Paul's motion is denied and UIM coverage is imputed as a matter of law into the St. Paul policy.  Accordingly, Hanson's cross-motion for summary judgment is denied as moot.

## BACKGROUND

Plaintiff David Hanson alleges that on March, 15, 2007, while driving to a business meeting in Washington on behalf of his employer, ITC Constructors Corp. ("ITC"),  his car was struck by an SUV driven by Jeffrey Capener, an employee of Wallace Klor & Mann.  Hanson sustained serious injuries.  At the time of the accident, Hanson was an Oregon resident and his car was registered, licensed, and garaged in Oregon.  Hanson alleges that he sued Capener and his employer, both of whom were insured, and the suit settled for $350,000, with Hanson receiving $196,512.00.[1]  Hanson also sought recovery for losses beyond that amount from St. Paul, which issued ITC a liability insurance policy covering non-owned and hired autos used in

---

[1] By contrast, Hanson stated in oral argument that he and his wife, each bringing separate suits, recovered a total of $600,000, which was apparently appointed for Mr. Hanson's personal injuries and his wife's loss of consortium

ITC's business.[2] St. Paul refused to pay Hanson's claim, stating that the policy does not include any uninsured or underinsured motorist coverage for non-owned vehicles. That policy is the focus of the present litigation.

## I.    The Policy

The insurance policy at issue protects ITC against a variety of losses, including providing liability coverage for autos not owned by ITC. The policy lists "ITC Constructors Corp." as the insured, with a Washington address. (Bernstein Decl., #11, Ex. 1 at 1.) The insurance agent is listed as Kibble & Prentice, also located in Washington. *Id.*

### A.    Auto Coverage

The "Auto Coverage Summary" section of the policy describes "the Limits of Coverage that apply to your Commercial Auto Protection" through a series of check boxes and spaces for explanatory text. (Bernstein Decl., #11, Ex. 1 at 117.) The policy states that "[a] blank section or space indicates no coverage." *Id.* For example, the policy indicates the extent of "Auto Liability Protection" by checking boxes labeled "Hired autos" and "Non owned autos" while leaving other boxes unchecked, and including under the heading "Limit of Coverage" the notation "$1,000,000 each accident." *Id.* Most significant to this dispute, the section entitled "Auto Uninsured Motorist Protection" contains sub-sections called "Uninsured Limits of Coverage" and "Underinsured Limits of Coverage," both of which are blank. *Id.* at 119-120.

### B.    References to State Laws

---

[2] Apparently, Hanson also had a motor vehicle liability policy on the car but the amount of his UIM coverage did not exceed his recovery from Capener and Wallace Klor & Mann.

The policy also makes several references to Oregon and Washington state law. For example, the policy includes a section called "General Rules-Washington" which purports to change the policy to comply with Washington law if the insured's address is in Washington. *Id.* at 12. There are also two sections referencing Oregon law – the "Oregon Required Endorsement" and the "Commercial Auto Required Endorsement" – both of which purport to change the policy to comply with Oregon law if the insured has an address outside of Oregon and if other conditions apply. *Id.* at 25, 28. Nowhere does the policy include a choice-of-law provision listing a particular state's law to be applied in case of a dispute concerning the policy.

## LEGAL STANDARDS

### I.     Motion for Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is not proper if material factual issues exist for trial. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 318, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995), *cert. denied*, 116 S.Ct. 1261 (1996). When considering a motion for summary judgment, the district court's role is not to weigh the evidence, but merely to determine whether there is a genuine issue for trial. *Liberty Lobby*, 477 U.S. at 249; *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997).

A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Only after the moving party has made such a showing does the burden shift to the opposing party to show that a genuine issue of fact remains. *See* Fed. R. Civ. P. 56(e).

To establish the existence of a genuine issue of material fact, the non-moving party must make an adequate showing as to each element of the claim on which the non-moving party will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 322-23; *see also Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). The opposing party may not rest on conclusory allegations or mere assertions, *see Taylor*, 880 F.2d at 1045; *Leer v. Murphy*, 844 F.2d 628, 631 (9th Cir. 1988), but must come forward with significant probative evidence, *see Liberty Lobby*, 477 U.S. at 249-50; *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). The evidence set forth by the non-moving party must be sufficient, taking the record as a whole, to allow a rational jury to find for the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Taylor*, 880 F.2d at 1045.


### DISCUSSION

I.    **St. Paul's Motion for Summary Judgment**

A.    **Overview**

Despite the complexity of the parties' briefing, St. Paul's motion reduces to only two issues: (1) which state's under-insured motorist (UIM) law should be applied; and (2) whether

that state's law requires UIM coverage as a part of the St. Paul policy. Although differing in their reasoning, both parties agree that Oregon law should be used to analyze the potential availability of statutorily mandated UIM coverage. I concur. As to the merits, St. Paul argues that it is entitled to summary judgment because the policy at issue expressly states that it is excess insurance and is therefore an "excess liability" policy which Or. Rev. Stat. § 742.468 exempts from the requirement to provide UIM coverage. Hanson, however, maintains that the St. Paul policy is ambiguous concerning whether the policy is a "true" excess policy or merely a primary policy with an excess "other insurance" clause. Therefore, Hanson argues, the ambiguity should be resolved against St. Paul, the policy should be deemed a "motor vehicle bodily injury liability policy," and under-insured motorist coverage should be imputed.

Although both parties primarily focus on interpreting the insurance contract's use of the term "excess," I note that a different sort of analysis is required. First, I interpret the phrase "excess liability policies" in Or. Rev. Stat. § 742.468 to determine the Oregon legislature's intended meaning. Second, I examine the insurance contract in this case to determine whether it qualifies as an "excess liability policy" exempt from UIM coverage. Ultimately, I find that the St. Paul policy does not constitute an "excess liability policy," and consequently, I deny St. Paul's motion for summary judgment.

### B.   Choice-Of-Law for UIM Coverage

#### 1.   No Choice-of-Law Provision in the Policy

As an initial matter, I differ from both parties in my view that the St. Paul policy does not include a choice-of-law provision dictating the substantive law governing a dispute on the policy.

Page 6 - AMENDED OPINION AND ORDER

*See Young v. Mobil Oil Corp.*, 85 Or. App. 64, 67, 735 P.2d 654 (Or. Ct. App. 1987) (generally giving parties the autonomy to choose the law that is to govern their contracts). A close examination of the policy reveals that the provisions cited by plaintiff do not constitute a choice-of-law provision governing the entire policy, but rather, endorsements changing the policy in specific ways to comply with discrete aspects of Oregon law. (D.'s Br., #10, Ex. 1, at 25-27) ("Oregon Required Endorsement" making changes to the policy concerning cancellation, increases in premium, decreases in coverage, etc.); (D.'s Br., #10, Ex. 1, at 28-31) ("Commercial Auto Required Endorsement Oregon" making various changes to the policy for autos registered or mainly garaged in Oregon). Accordingly, the terms of the policy do not necessarily make the policy subject to Oregon law.

### 2.    Choice-of-Law Analysis

Therefore, I proceed with a conventional choice-of-law analysis to determine which substantive insurance law applies to this policy. "When a federal court sits in diversity, it must look to the forum state's choice of law rules to determine the controlling substantive law." *Patton v. Cox*, 276 F.3d 493, 495 (9th Cir. 2002). Oregon is the forum state, so I apply Oregon's choice-of-law rules. In Oregon, before embarking on a choice of law analysis, a court must first determine whether the laws of the states having a connection with the controversy are in conflict on the particular issue. *Lilienthal v. Kaufman*, 239 Or. 1, 5, 395 P.2d 543 (Or. 1964). "The threshold question in a choice-of-law problem is whether the laws of the different states actually conflict." *Spirit Partners, LP v. Stoel Rives LLP*, 212 Or. App. 295, 301,157 P.3d 1194 (Or. Ct. App. 2007). When there is no material difference between the laws of the different states, only a

"false conflict" exists and Oregon law applies. *Waller v. Auto-Owners Ins. Co.*, 174 Or. App. 471, 175, 26 P.3d 845 (Or. Ct. App. 2001). "The proponent of the law of another forum has the obligation to identify material differences between the applicable law of Oregon and of the other forum." *Spirit Partners, LP*, 212 Or. App. at 301.

Here, neither party proposes application of Washington law. Morever, I agree with St. Paul that Oregon's UIM statute (Or. Rev. Stat. § 742.502) and Washington's UIM statute (Wash. Rev. Code § 48.22.030) are substantially similar concerning the debated issues in this case. Therefore, I apply the Oregon UIM statute.

### C.    Whether the St. Paul Policy is an Excess Liability Policy

The central question in St. Paul's motion for summary judgment is whether Oregon's insurance statutes require UIM coverage for the insurance policy at issue.

### 1.    Oregon's UIM Statute

Oregon law requires certain insurance policies to provide uninsured motorist (UM) coverage:

> *Every motor vehicle liability policy* insuring against loss suffered by any natural person resulting from liability imposed by law for bodily injury or death arising out of the ownership, maintenance or use of a motor vehicle shall provide in the policy or by indorsement on the policy uninsured motorist coverage when the policy is either:
> (a) Issued for delivery in this state; or
>
> (b) Issued or delivered by an insurer doing business in this state with respect to any motor vehicle then principally used or principally garaged in this state.

Or. Rev. Stat. § 742.502(1) (emphasis added). In turn, the statute requires that UM coverage also include UIM coverage, as follows:

A motor vehicle bodily injury liability policy shall have the same limits for uninsured motorist coverage as for bodily injury liability coverage unless a named insured in writing elects lower limits. The insured may not elect limits lower than the amounts prescribed to meet the requirements of ORS 806.070 for bodily injury or death. *Uninsured motorist coverage shall include underinsurance coverage* for bodily injury or death caused by accident and arising out of the ownership, maintenance or use of a motor vehicle with motor vehicle liability insurance that provides recovery in an amount that is less than the insured's uninsured motorist coverage. *Underinsurance coverage shall be equal to uninsured motorist coverage less the amount recovered from other motor vehicle liability insurance policies.*

Or. Rev. Stat. § 742.502(2)(a) (emphasis added).

A named insured, however, may elect UM and UIM limits that are lower than liability limits, but only by a signed writing acknowledging that the insured was offered coverage equal to the liability limits. Or. Rev. Stat. § 742.502(2)(b).

### 2.    Imputation of UIM Coverage When Lacking

Oregon courts generally hold that an insurer's failure to provide UIM coverage when required by statute results in the imputation of such coverage. *See Buccino v. California Casualty Ins. Co.*, 159 Or. App. 654, 659, 978 P2d 441 (Or. Ct. App. 1999) (reversing summary judgment for insurer because insurer failed to show that it had offered UM/UIM coverage equal to liability limits); *accord Savage v. Grange Mutual Ins. Co.*, 158 Or. App. 86, 970 P2d 695 (Or. App. Ct. 1999) (breach of the statutory duty to offer UIM coverage entitled an insured to seek reformation of the policy and also resulted in the imposition of conforming UIM coverage by operation of law); *Taylor v. Or. Ins. Guar. Ass'n*, 99 Or. App. 554, 559, 783 P.2d 49, 50 (Or. Ct. App. 1989) ("The result of the failure of an insurer to offer such coverage is that the court will read into the insurance contract the coverage which the insurer should have offered") (internal

Page 9 - AMENDED OPINION AND ORDER

citations and quotations omitted).

### 3.    Exemption from UIM Coverage Requirement

Oregon law, however, exempts certain insurance policies from providing UM and UIM coverage.  In particular, comprehensive general liability policies, umbrella liability policies, and "excess liability policies" are not considered "motor vehicle liability policies" for the purposes of "statutes mandating kinds or amounts of coverage that motor vehicle liability policies must contain . . . ."  Or. Rev. Stat. § 742.468.[3]

### 4.    Statutory Interpretation

In construing a statute, Oregon courts seek to discern the intent of the legislature.  *PGE v. Bureau of Labor and Industries*, 317 Or. 606, 610, 859 P.2d 1143 (Or. 1993).  First, the court looks to the text and context of the statute.  *Id.* at 610-11.  The court may also examine legislative history if useful to the court's analysis.  *State v. Gaines*, 346 Or. 160, 171-72, 206 P.3d 1042 (Or. 2009).  Finally, if ambiguity remains after examining the text, context, and legislative history, the court resorts to legal maxims.  *Gaines*, 346 Or. at 164-65.  Here, I analyze Or. Rev. Stat. § 742.468 to determine the meaning of the statutory term "excess liability polic[y]."

### (1)    Text

The statute at issue, Or. Rev. Stat. § 742.468, begins with the caption: "Certain policies not considered motor vehicle liability policies."  The statute provides:

---

[3] The statute legislatively overruled an earlier Oregon Court of Appeals decision, *American Economy Ins. Co. v. Canamore*, 114 Or. App. 348, 352, 834 P2d 542 (Or. Ct. App.1992), which held that the injured insured's umbrella policy was subject to the provisions of the UIM statute.

> For purposes of statutes mandating kinds or amounts of coverage that motor vehicle
> liability policies must contain, the following shall not be considered motor vehicle
> liability policies:
> > (1) Comprehensive general liability policies.
> > (2) *Excess liability policies*.
> > (3) Umbrella liability policies

Or. Rev. Stat. § 742.468 (emphasis added).   The statutory text provides no further definition for

the phrase "excess liability policies" and is therefore unhelpful.  Nor are there any relevant prior

Oregon Supreme Court interpretations of the text, which under Oregon law become "part of the

statute as if written into it at the time of its enactment."[4] *Walther v. SAIF Corp.*, 312 Or. 147,

149, 817 P.2d 292 (Or. 1991) (citing *State v. Clevenger*, 297 Or. 234, 244, 683 P.2d 1360 (Or.

1984)).

Common-use and legal dictionaries also may be consulted to give meaning to a statutory

word or phrase.  *See Fresk v. Kraemer*, 337 Or. 513, 521, 99 P.3d 282 (Or. 2004) (using

Webster's Third New International Dictionary and Black's Law Dictionary).   Here, however, the

two relevant dictionaries provide somewhat differing definitions of "excess insurance."

Webster's Third New International Dictionary defines "excess insurance" as "insurance in which

the underwriter's liability does not arise until the loss exceeds a stated amount and then only on

the excess above that amount."  Webster's Third New International Dictionary 792 (unabridged

---

[4] Oregon courts have interpreted this provision only once, and then, only in the context of
an umbrella liability policy. In *Savage v. Grange Mut. Ins. Co.*, the Court of Appeals faced the
narrow question of whether Or. Rev. Stat. § 742.468, which became effective after defendant
issued an umbrella policy but before the accident, precluded recovery of UIM benefits. *See* 158
Ore. App. 86, 88, 970 P.2d 695 (Or. Ct. App. 1999). The Court held that Or. Rev. Stat. § 742.468
applied only to insurance policies issued after the effective date of the statute (November 1,
1993). *Id.* at 95.  The *Savage* decision, however, discussed only umbrella liability policies and
thus provides no guidance concerning the meaning of "excess liability policies."

ed. 1971). In doing so, Webster's seems to exclude from "excess insurance" any policy that does not state a fixed liability amount above which it provides coverage. By contrast, Black's Law Dictionary defines "excess insurance" as "[a]n agreement to indemnify against any loss that exceeds the amount of coverage under another policy." Black's Law Dictionary 872 (9th ed. 2009). This more expansive definition allows appears to include policies which do not identify a specific amount above which they provide coverage.

### (2)    Context

Contextual evidence includes provisions of the same statute and related statutes, as well as the historical context surrounding the statute's enactment, amendment or repeal. *See State v. Perry*, 336 Or. 49, 54–55, 77 P3d 313 (Or. 2003). Historical context encompasses the existing common law at the time of adoption of the statute. *Fresk*, 337 Or. at 520. The focus of an inquiry into common law includes discerning whether the legislature intended specific words to carry the same meaning they had under the common law. *Butler v. United Pacific Ins. Co.*, 265 Or. 473, 479 n. 3, 509 P.2d 1184 (1973).

First examining other statutory provisions, I note that Or. Rev. Stat. § 742.468 closely follows Or. Rev. Stat. § 742.464, which refers to "excess or additional coverage." [5]   Or. Rev. Stat. § 742.464 provides:

> Any policy which grants the coverage required for a motor vehicle liability insurance policy under ORS 742.450, 806.080 and 806.270 may also grant any lawful coverage in excess of or in addition to the required coverage, and such excess or additional coverage

---

[5] Or. Rev. Stat. § 742.464 predates the enactment of Or. Rev. Stat. § 742.468, and is therefore properly analyzed as context for the statutory phrase at issue contained within Or. Rev. Stat. § 742.468.

shall not be subject to the provisions of ORS 742.031, 742.400 and 742.450 to 742.464.
With respect to a policy which grants such excess or additional coverage only that part of
the coverage which is required by ORS 806.080 and 806.270 is subject to the
requirements of those sections.

*Id.* The Oregon Supreme Court interpreted Or. Rev. Stat. § 742.464 in a manner suggesting that

the phrase "excess or additional coverage" refers to the portion of coverage providing limits or

other benefits beyond those required by law. *Collins v. Farmers Ins. Co.*, 312 Or. 337, 342, 822

P.2d 1146 (Or. 1991) ("The first clause [of Or. Rev. Stat. § 742.464] means that liability insurers

can write motor vehicle liability insurance policies with *higher limits and coverage* than that

required by ORS 742.450, 806.080, and 806.270") (emphasis added). Another Oregon Supreme

Court decision clarifies that the legislature's use of the term "excess" in the predecessor statute to

Or. Rev. Stat. § 742.464 refers to "not only the risk insured against but also the monetary amount

of insurance." *Or. Auto. Ins. Co. v. Thorbeck*, 283 Or. 271, 275, 583 P.2d 543 (Or. 1978).

Thus, "excess . . . coverage" as described in Section 742.464 apparently encompasses liability

policies providing coverage limits or other coverage features exceeding the bare minimums

required by statute. In other words, "excess" derives its meaning from comparison to statutory

requirements. St. Paul suggests, therefore, that a similar reading of the intent behind the word

"excess" should be applied in interpreting the phrase "excess liability policies" in Or. Rev. Stat. §

742.468.

I disagree. An examination of the historical context surrounding the enactment of Or.

Rev. Stat. § 742.468 suggests a much different, and more plausible, statutory intent. Through an

examination of Oregon Supreme Court cases discussing various types of excess insurance

policies, I discern the common law meaning of "excess" insurance prior to the 1993 enactment of

§ 742.468, which is included in the statute's historical context for purposes of statutory

interpretation.  For example, in one case, the Oregon Supreme Court summarized the basic

nomenclature used to describe multiple levels of insurance policies, including excess insurance:

> Liability insurance policies frequently are arranged in tiers, with each level of policy
> designed to "kick in" when the coverage provided by the lower level of insurance is
> exhausted. The general nomenclature surrounding this phenomenon labels an insured's
> basic insurance as the "primary" insurance, the insured's next level of insurance (that
> covers risks involving amounts in excess of the primary insurance) as "excess" insurance,
> and the insured's final level of insurance (that covers risks only after and to the extent that
> lower levels do not) as "umbrella" insurance.

*Hoffman Constr. Co. v. Fred S. James & Co.*, 313 Or. 464, 466 n.1, 836 P.2d 703 (Or. 1992).

By far the most helpful discussion of excess coverage comes from the Oregon Supreme

Court's 1985 decision in *Maine Bonding & Casualty Co. v. Centennial Insurance Co.* 298 Or.

514, 693 P.2d 1296 (Or. 1985).  In that case, Great Balls of Fire, Inc. ("Fire) purchased two

property damage liability policies from separate insurers, one providing primary coverage

(Centennial) and the other providing excess coverage (Maine).  *Id.* at 516.  After Fire caused

damage to property, the claim was settled with Centennial paying up to its policy limit and Maine

paying the remainder.  *Id.*  Maine then sued Centennial, arguing that Centennial's misconduct in

investigating and defending against the property owner's claim caused an increase in Maine's

share of the settlement.

Initially, the Oregon Supreme Court distinguished "classic" excess insurance from

policies containing excess "other insurance" clauses.  The Court embarked on its analysis by

stating: "This case involves a classic primary-excess insurance relationship."  *Id.*  The Court then

commented in a footnote:

> The text uses the phrase "classic primary-excess insurance relationship." This is not a case in which two or more liability policies each provide valid and collectible insurance against a loss and the question is whether one or the other is "primary" or "excess." Such cases normally involve construction of the "other insurance" clauses of the policies. *Lamb-Weston, Inc. v. Ore. Auto. Ins. Co.* 219 Or 110, 341 P2d 110, 346 P2d 643 (1959), is the seminal Oregon case in this area.

*Id.* at 516 n.1.  Moreover, the Court several times referred to Maine as the "excess liability insurer" or simply the "excess insurer" and to the Maine policy as either an "excess property damage liability policy," "excess coverage," or "excess insurance."  *Id.* at 516, 517, 519, 520.

Later in the opinion, the Court described the excess policy provided by Maine:

> The excess policy is written with the existence of the primary policy in mind.  Maine's policy in this case, on its declarations page, makes explicit reference to the Centennial primary coverage in a "schedule of underlying insurances." Maine's policy provides that its liability is "the excess of . . . the limits of the underlying insurances as set out in the schedule in respect of each occurrence covered by said underlying insurances." Maine's policy also contains this provision: "It is a condition of this policy that the policy or policies referred to in the attached 'Schedule of Underlying Insurances' shall be maintained in full effect during the currency of this policy . . . ."

*Id.* at 520.  The Court's description Maine's excess insurance policy identifies several key characteristics.  First, the Maine excess policy was purchased by the same insured (Fire) that bought the primary policy.  Second, the Maine excess policy explicitly acknowledged the primary policy.  Finally, the Maine excess policy required maintenance of the primary policy as a condition of coverage.  Although the Court does not state that all "classic" excess policies necessarily have these attributes, it is fair to assume that a policy with these characteristics would be similarly treated as an example of "classic" excess insurance.

In contrast to the "classic" excess policy at issue in *Maine Bonding*, the Court addressed

an example of an excess "other insurance" clause in *Lamb-Weston, Inc. v. Or. Auto. Ins. Co.*, 219

Or. 110, 341 P.2d 110 (Or. 1959). Another Oregon Supreme Court decision ably summarized

the facts, reasoning, and holding of *Lamb-Weston*:

> In *Lamb-Weston* the controversy was between the named insured, St. Paul, and the
> omnibus insured, Oregon Auto. St. Paul had an excess "other insurance" clause and
> Oregon Auto a pro rata clause. We determined that any attempt to classify one policy as
> primary and the other as secondary, and thus reconcile the clauses, is an exercise in
> "circular reasoning." We determined that if the provisions of one policy were not to yield
> to the other it was impossible to apply both equally; one could not, at the same time,
> prorate the liability of Oregon Auto and assess St. Paul only for the excess over Oregon
> Auto's liability. We solved this dilemma by declaring the "other insurance" clauses
> repugnant to each other and, therefore, to be rejected and not considered part of either
> insurance contract. With these clauses ignored, the liability of each company was prorated
> by the proportion that each bore to the total limit of liability. The basic holding of
> *Lamb-Weston* is that repugnant policy provisions will be erased from the contracts and
> ignored in construing the "other insurance" provisions of contracts.

*Gen. Ins. Co. v. Saskatchewan Gov't Ins. Office*, 238 Or. 8, 18-19, 391 P.2d 616 (Or. 1964),

*overruled on other grounds by Liberty Mut. Ins. Co. v. Truck Ins. Exch.*, 245 Or. 30, 420 P.2d 66,

(Or. 1966).

The policy at issue in *Lamb-Weston* is very different from that in *Maine Bonding*. The St.

Paul policy provided: "If the Insured's liability under this policy is covered by any *other valid*

*and collectible insurance*, then this policy shall act as *excess insurance* over and above such

other insurance." *Lamb-Weston*, 210 Or. at 118 (emphasis added). Unlike the "classic" excess

policy in *Maine Bonding*, the St. Paul policy was the sole coverage obtained by the insured, and

therefore never referenced another primary policy or required maintenance of a primary policy.

Moreover, unlike in *Maine Bonding*, the Court recognized the contingent nature of the excess

coverage provided for in the St. Paul policy, as well as the other policies at issue. *Id.* ("each

company by its 'other insurance' clause seeks to limit its liability *if other insurance is available* to pay a part or all of an insured's loss") (emphasis added).

Thus, to the extent possible from the limited case law, I determine that prior to enactment of Or. Rev. Stat. § 742.468, Oregon common law recognized that a "classic" excess insurance policy resembled the policy in *Maine Bonding*. Such "classic" excess insurance was an additional policy purchased by a single insured specifically referencing the underlying primary policy and providing coverage beyond that primary policy's liability limits. Oregon common law also recognized a different type of coverage created by an excess "other insurance" clause, like St. Paul's policy in *Lamb-Weston*. That coverage was ordinarily primary, but became secondary when another insurance covered the liability.

The legislature's use of the phrase "excess liability policies" in Or. Rev. Stat. § 742.468 more closely resembles the type of non-contingent "classic" excess insurance policy recognized in *Maine Bonding* than the excess "other insurance" clause existing within an otherwise primary insurance policy recognized in *Lamb-Weston*. First, Or. Rev. Stat. § 742.468 references three types of excluded "policies," suggesting that "excess liability policies" are defined by something more than the presence of other insurance clauses that sometimes render their coverage excess. Further, interpreting "excess liability policies" to refer also to the type of policy in *Lamb-Weston* would introduce needless ambiguity into the statutory phrase, since the *Lamb-Weston* policy could provide either primary coverage or excess coverage depending on the existence of other insurance. Therefore, the historical context of Or. Rev. Stat. § 742.468 suggests that the legislature intended that "excess liability policies" refer to "classic" excess liability insurance

taken out by an insured in addition to, and in recognition of, the insured's primary insurance.

### (3)    Legislative History

Based on legislative history research conducted by the parties, it appears that Or. Rev. Stat. § 742.468 was a last-minute addition to two unrelated bills and was adopted without any discussion by legislators or others providing guidance on the legislative intent behind the phrase "excess liability policies." Legislative history is therefore unhelpful in clarifying the legislature's intent in exempting "excess liability policies" from mandated UIM coverage.

### (4)    Maxims of Statutory Construction

Since the text and historical context do not make the meaning of "excess insurance policies" completely unambiguous, I look to maxims of statutory interpretation for further insight. One of these maxims provides that Oregon courts endeavor to resolve statutory ambiguity by determining the legislature's likely interpretation of the statute had the legislature specifically considered the issue. *Marks v. McKenzie High Sch. Fact-Finding Team*, 319 Or. 451, 457, 878 P.2d 417 (Or. 1994). One method for determining the legislature's likely interpretation is to assume that the legislature would have given the same meaning to a statutory term as other jurisdictions with comparable statutory schemes have given to that term. *Id.* at 457-58.

Washington, like Oregon, exempts certain policies from UIM requirements. Rev. Code Wash. § 48.22.030(2). Unlike Or. Rev. Stat. § 742.468, the Washington statute provides a somewhat more illuminating definition of the type of excess policies that are exempted. It provides that: "The coverage required to be offered under this chapter is not applicable to general

liability policies, commonly known as umbrella policies, or *other policies which apply only as excess to the insurance directly applicable to the vehicle insured.*" *Id.* (emphasis added). In applying that exemption, Washington courts apply a "functional approach." *Diaz v. Nat'l Car Rental Sys.*, 143 Wn. 2d 57, 62, 17 P.3d 603 (Wash. 2001). The functional approach allows the courts to avoid crafting a precise definition of "excess" coverage, instead examining each policy and determining whether it functions more like a primary policy or an excess policy. *Id.* In applying that approach, the Washington Supreme Court noted that primary insurance is defined as "insurance that attaches immediately on the happening of a loss." *Id.* (quoting Black's Law Dictionary 807 (7th ed. 1999)). After interpreting the policy terms and referring to extrinsic evidence, the Court determined that the policy provided primary, rather than excess, liability insurance. *Id.* at 67. Although Washington's statutory scheme is similar to Oregon's, its courts have effectively defined excess insurance as that which is not primary insurance, leaving most of the definitional task to individual courts interpreting specific policies. This approach, while streamlined, does not assist my efforts at statutory construction.

California also has a similar statutory scheme. Cal. Ins. Code § 11580.2(a)(1) provides an exemption to UIM requirements for automobile liability coverage provided "only on an excess or umbrella basis." California courts have faced the question of what qualifies as excess insurance, although not in the context of whether a policy should be exempt from UIM requirements. For example, in *Pac. Indem. Co. v. Bellefonte Ins. Co.*, 80 Cal. App. 4th 1226 (2000), the Court addressed an insurer's argument that it's "other insurance" clause made its policies "excess." *Id.* at 1235. The Court noted that whereas primary insurance provides

coverage immediately upon the occurrence of a loss, excess insurance provides in its policy terms that liability only attaches after a predetermined amount of primary coverage has been exhausted. *Id.* Moreover, the Court cited with approval another case holding that a policy is primary when it does not exhibit characteristics of a true excess policy, such as specific identification of an underlying primary coverage. *Id.* (citing *Commerce & Industry Ins. Co. v. Chubb Custom Ins. Co.*, 75 Cal. App. 4th 739, 746 (1999)). This distinction drawn by California courts echoes Oregon court's discussions of the "classic" primary-excess relationship, as opposed to excess "other insurance" clauses.

Arizona also provides a helpful comparison. Although Arizona's statutes do not explicitly exempt excess insurance from UIM coverage, its Supreme Court has taken the opportunity to differentiate between "true" excess insurance and excess "other insurance" clauses. In *St. Paul Fire & Marine Ins. Co. v. Gilmore*, 812 P.2d 977, 980 (Ariz. 1991), the Arizona Supreme Court observed that "true excess" coverage occurs "when the same insured has purchased underlying coverage for the same risk." Moreover, the Court suggested that such true excess insurance is written with consideration given to the underlying primary policy. *Id.* The Court contrasted that type of coverage with coverage which becomes excess when "other insureds have purchased insurance that fortuitously may be applicable to a given loss." *Id.* at 981. In fact, the Ninth Circuit has both recognized and expounded upon the Arizona Supreme Court's distinction between "true excess" insurance and excess other insurance clauses.[6]

---

[6] The Ninth Circuit wrote:

> An "excess" or "umbrella" insurance policy serves a different purpose than a primary policy. A "true" excess policy protects the insured "in the event of a

Other state courts have also reiterated this distinction. *See, e.g., Fed. Ins. Co. v. St. Paul Fire & Marine Ins. Co.*, 638 So. 2d 1132, 1135–36 (La. Ct. App. 1994) ("the inclusion of an 'excess clause' within the 'other insurance' provision of an insurance policy does not transform a primary policy into an excess policy. . . A true excess policy is one that provides that the insurer is liable only for the excess above and beyond that which may be collected from the primary insurer.   It is customary in such policies to include a requirement for underlying primary insurance for a certain amount and to list such other primary insurance within the excess policy. On the other hand an 'excess' other insurance clause within a primary policy is considered a self-serving provision that attempts to make the insurer only secondarily liable if another unexhausted policy is available to cover claims."); *see also Peerless Ins. v. Vermont Mut. Ins. Co.*, 849 A.2d 100, 102 (N.H. 2004).

---

catastrophic loss in which liability exceeds the available primary coverage." 16 Couch on Insurance § 220: 32 (3d ed. 1995); *See also* 8C Insurance Law and Practice § 5071.65 at 107 (1981) ("In this day of uncommon, but possible, enormous verdicts, [excess policies] pick up this exceptional hazard at a small premium."). A primary policy, alternatively, provides coverage from" dollar one" for a given loss. This clear distinction can be muddied by the inclusion of an "other insurance" clause in an otherwise primary policy. The inclusion of such a clause will not convert a primary policy into "true" excess coverage. The underlying purpose of the primary policy remains the same and it must contribute to an insured's loss before "true" excess coverage attaches. However, determining whether a given policy is primary (with an other insurance clause) as opposed to excess can sometimes be difficult. 16 Couch on Insurance § 220:32 ("It is extremely difficult to draw any black letter rules of law. There is usually no way . . . to avoid doing a time-consuming, complete coverage analysis.") . . . we rely on the Arizona Supreme Court's standards for determining when a particular policy is "true" excess insurance.

*AMHS Ins. Co. v. Mut. Ins. Co.*, 258 F.3d 1090, 1093 (9th Cir. 2001).

Page 21 - AMENDED OPINION AND ORDER

In sum, the distinction only hinted at by Oregon courts in *Maine Bonding* has been more fully developed in other states with exemptions to UIM regulations for excess insurance. Overall, these other states recognize a crucial difference between true excess policies and excess "other insurance" clauses found within primary policies. True excess insurance policies usually provide coverage in excess of a fixed amount of liability established by a known underlying primary insurance policy. By contrast, policies containing excess "other insurance" clauses ordinarily provide primary coverage from the first dollar of a loss, except when other collectible insurance exists, in which case they provide coverage in excess of a variable amount of liability, depending on the limit of that other collectible insurance. Through an analysis of the text and context of Or. Rev. Stat. §742.468, as well as maxims of statutory construction, I determine that "excess liability policies" are those "classic" or "true" excess policies that only provide coverage above the known limits of a primary policy purchased by the same insured.

### b.    Application to St. Paul's Policy

I now examine the St. Paul policy at issue to determine whether it is an example of an excess liability policy intended to be exempt from UIM coverage by the Oregon legislature. The policy twice discusses "excess insurance." First, in what appears to be an introduction to the coverage summary for an insurance agreement entitled "Liability Protection for Autos You Don't Own," the policy states:

> This agreement is excess insurance and covers claims after any other insurance that applies to the claim has been used up. Of course there are some limitations which are explained later in this agreement.

(Bernstein Decl., #11, Ex. 1, at 121.) The policy also includes a clause entitled "Other

Insurance," which further explains the "excess" nature of the policy:

> This agreement provides *excess insurance* for covered autos you don't own.  Excess insurance applies after other collectible insurance has been used up.  This agreement is *primary insurance* for liability for covered bodily injury or property damage assumed under a covered contract. . . . When insurance provided by another insurer applies to covered bodily injury or property damage that results from an accident on the same primary or excess basis as this agreement, we'll pay only our share of your accident.

*Id.* at 129 (emphasis added).

Applying the foregoing definition of "excess liability policies" as those "classic or "true" excess policies to the St. Paul policy at issue here, I am compelled to conclude that this policy is actually a primary motor vehicle liability policy masquerading as an excess liability policy. Moreover, to the extent that the policy is ambiguous on this issue, I construe that ambiguity against its drafter, St. Paul.  *See Holloway v. Republic Indemnity Co. of Am.*, 341 Or. 642, 650, 147 P.3d 329 (Or. 2006).

While the St. Paul policy labels itself as an excess policy, that fact in and of itself does not transform a primary policy into an excess policy.  *See AMHS Insurance Company*, 258 F.3d at 1093; *Federal Insurance Company*, 638 So. 2d at 1135–36.  Courts in this circuit have taken a functional approach to determine whether a particular policy is primary or excess.  *See Diaz*, 143 Wn. 2d at 62.   Further, the Ninth Circuit, citing one of the seminal insurance law treatises, recognizes that it can be extremely difficult to draw any black letter rules of law on the issue. *See AMHS Insurance Company*, 258 F.3d at 1093 (adopting the Arizona Supreme Court's standards for identifying "true" excess insurance policies ).

The St. Paul policy in this case contains none of the characteristics of a "classic" or "true"

excess policy. First, an excess policy typically is written with the primary policy in mind and acknowledges that underlying policy, often by specific reference. *See Maine Bonding*, 298 Or. at 520. Here, St. Paul's policy nowhere identifies a primary auto liability policy to which St. Paul's policy provides excess coverage. Indeed, it would be nearly impossible for St. Paul's policy to be written with the primary insurance policy or policies in mind, since each ITC employee insured under the St. Paul policy likely possessed a slightly different individual auto liability policy. Second, an excess policy ordinarily requires maintenance of the underlying policy and establishes its specific limits. *Id.* Here, the St. Paul policy does not mandate ITC employees insure their vehicles, and consequently, the policy establishes no specific dollar limit above which it provides excess coverage. Third, excess policies often are purchased and maintained by the same insured that possesses the primary insurance policy. *Id.* Here, ITC purchased the St. Paul policy, while ITC employees ostensibly maintain their own primary policies on their vehicles.

Examining one particular factual scenario demonstrates why the St. Paul policy cannot be a "true" excess insurance policy. Suppose an ITC employee fails to insure his vehicle, in defiance of state law, and while driving in the scope of his employment causes a catastrophic accident. St. Paul concedes at oral argument that, in the case of such an uninsured driver, its policy would pay from the first dollar of the loss, since there is no other collectible insurance available. St. Paul still urges the court to characterize its policy as excess in that situation, albeit "excess to nothing." This construction, however, relies upon an extreme semantic contortion in attempting to demonstrate the true excess nature of the policy. Simply put, when there is no

other collectible insurance, as in the case of an uninsured ITC employee driving his own vehicle,

St. Paul's policy provides primary coverage.  By contrast, when there is other collectible

insurance, St. Paul's policy provides excess coverage.  Thus, St. Paul's policy functions like a

prototypical excess "other insurance" clause, making St. Paul secondarily liable if another policy

happens to cover the claim.

    When an insurance policy does not exhibit characteristics of a "true" excess policy, the

policy is considered a primary policy.  *Pacific Indemnity Company*, 80 Cal. App. 4th at 1235

(citing *Commerce & Industry Ins. Co. v. Chubb Custom Ins. Co.*, 75 Cal. App. 4th 739, 746

(1999)).  Accordingly, the St. Paul policy at issue here, which does not exhibit the characteristics

identified by courts as belonging to "true" excess policies, must be considered a primary policy.

Therefore, the St. Paul policy is not an "excess liability polic[y]," but rather a "motor vehicle

liability policy" which must provide UIM coverage under Or. Rev. Stat. §742.502.  St. Paul's

motion for summary judgment, which fundamentally relies on the assumption that the policy is

an excess liability policy, cannot succeed.

    Moreover, there is no dispute that St. Paul failed to provide UIM coverage and failed to

obtain a written waiver from ITC of such coverage.  Oregon law thus requires the court to impute

UIM coverage into the St. Paul policy, even though Hanson has not moved for summary

judgment on that issue.  *See Savage*, 158 Or. App. at 94 ("the insured's breach of its statutory

duty to offer UIM coverage does not merely give rise to some inchoate entitlement to seek

reformation but, instead, results in the imposition of UIM coverage *ab initio* by operation of

law.")  Given imposition of UIM coverage as a matter of law, I need not to address Hanson's

contention that St. Paul fails to provide the policy in force at the time of the accident.

One important factual issues remains.  The parties will need to address the amount of UIM coverage to be imputed into the policy.  The appropriate amount of UIM coverage in a motor vehicle liability policy is "equal to uninsured motorist coverage less the amount recovered from other motor vehicle liability insurance policies." Or. Rev. Stat. § 742.502(2)(a).  Oregon's UIM statute provides that "[w]here applicable liability insurance policy limits are exhausted upon payment, settlement or judgment by division among two or more injured persons, 'amount recovered from other motor vehicle liability insurance policies' means the proceeds that are recovered by or on behalf of the injured person but does not include any proceeds of that liability policy received by other injured persons." Or. Rev. Stat. § 742.502(7).  Without the presentation of additional evidence concerning the amount of liability coverage in the St. Paul policy and Hanson's proceeds from other liability policies, the court could not calculate the extent of UIM coverage according to the foregoing statutory formula.

//

//

//

//

//

//

//

//

Page 26 - AMENDED OPINION AND ORDER

## CONCLUSION

St. Paul's motion for summary judgment (#8) is denied and Hanson's cross-motion for summary judgment (#15) is denied as moot.

IT IS SO ORDERED.

Dated this 22nd day of March, 2011.

Honorable Paul Papak
United States Magistrate Judge